FILED - GR
January 28, 2009 10:48 AM
RONALD C. WESTON, SR., CLERK
U.S. DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
BY: FHW/

# UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF MICHIGAN

UNITED STATES OF AMERICA
V.
SOLOMON HAKEEM JOHNSON,
SALVATORE RAHEEM LOUIS, and
EMMANULE DAVON DAVIS

CRIMINAL COMPLAINT

Case Number: 1:09-MJ-06

(Name and Address of Defendant)

I, the undersigned complainant state that the following is true and correct to the best of my knowledge and belief. On or about  5/08 and 1/09  in  KENT  County, in the  WESTERN  District of  MICHIGAN  defendant(s) did,

(Track Statutory Language of Offense)

conspire to possess with intent to distribute crack cocaine

in violation of Title  21  United States Code, Section(s)  846; 841(a)(1)  .

I further state that I am a(n)  SPECIAL AGENT  and that this complaint is based on the following facts:

SEE ATTACHED AFFIDAVIT

Continued on the attached sheet and made a part of this complaint:  ☒ Yes  ☐ No

Signature of Complainant

SEAN P. BURNS
Printed Name of Complainant

Sworn to before me and signed in my presence,

1/28/2009                                            at    GRAND RAPIDS        MICHIGAN
Date                                                         City                State

HUGH W. BRENNEMAN, JR.     US MAGISTRATE
Name of Judge                Title of Judge              Signature of Judge

# AFFIDAVIT

Sean P. Burns, a Special Agent with the Federal Bureau of Investigation (FBI), being duly sworn, deposes and states the following:

1.  I am a Special Agent with the Federal Bureau of Investigation (FBI). I was sworn in as an FBI Special Agent on 3 November 1991. I am currently assigned to the Grand Rapids Resident Agency, Detroit Field Division. I reported to the Grand Rapids Office on 19 February 2001. Prior to being assigned to Grand Rapids, I was assigned as an Agent in the Pittsburgh Division, Pittsburgh, PA. During my time in Pittsburgh, I was assigned to the Organized Crime/Drug Squad, where I participated in numerous drug investigations. I was also assigned to the Reactive Squad, which was responsible for street gang investigations and bank robberies. While assigned to the Reactive Squad, I was assigned to an investigation of a violent street gang which resulted in the indictment, arrest, and conviction of 54 gang members for various federal violations to include drug trafficking, firearms violations and Hobbs Act violations.

2.  Since my transfer to Grand Rapids, I have primarily been assigned to investigations dealing with violent crimes, such as bank robberies, gangs, and fugitives. I am currently a member of the FBI sponsored Violent Crimes/Fugitive Task Force ("VCFTF") in Grand Rapids. I have testified numerous times in Grand Jury proceedings and District Court proceedings in the Western District of Pennsylvania and the Western District of Michigan.

3.  This investigation began as a bank robbery investigation into a series of bank robberies that have occurred over that past 3 years. The modus operandi of the robberies is similar in that 2-3 black males enter the bank in a take-over fashion. The armed robbers vault the teller counter, and steal money from the tellers drawers. The robbers then make their get away by vehicle. On several occasions, the robbers have gotten into the vault of the victim bank and have made off with tens of thousands of dollars. However, as will be seen below, the investigation has also revealed substantial evidence of crack cocaine trafficking. What follows is a summary of both investigations:

## Summary of Bank Robbery Investigation

4.  On Monday, 2/26/2007, the LaSalle Bank located at 2000 Lake Michigan Drive, NW, Grand Rapids, MI, was robbed by three black males. All three robbers brandished handguns during the robbery, and made oral demands of the victim tellers and bank employees. Upon entering the bank, the first robber ordered everyone to stay still. The second robber threw a bag at one of the victim tellers and told her to start filling it. As she was complying, the first robber began yelling at her, telling her to hold still. The second robber then vaulted the counter and began going through teller drawers.

5.      As the second robber vaulted the counter, robber three entered the bank. Robber three began to check offices and the restrooms off the lobby for people. After robber two finished cleaning out teller drawers, the robbers directed one of the victim tellers to open the vault. The victim teller opened the vault, and robber two entered and began taking money. After robber two finished stealing the money from the vault, all three robbers left the bank and drove off in a black, two door Chevy Blazer.

6.      Grand Rapids Police Department (GRPD) officers located the black Blazer shortly after the robbery, a few blocks from the bank. A witness advised he saw three black males exit the Blazer and enter a black Cadillac, driven by a white male with a "bad complexion". As the robbers were getting into the vehicle, one of the robbers dropped a glove. This glove was recovered, and was submitted for DNA analysis by GRPD. The bank's loss because of the robbery was $35,305.00.

7.      The vehicle identification number (VIN) for the Blazer was run through State of Michigan databases. The owner was interviewed. The owner advised she sold the vehicle to two black males who had called her on her cell phone. A grand jury subpoena was issued for the seller's cell phone records.

8. On Saturday, 5/19/2007, the United Bank located at 2137 Wealthy Street, SE, East Grand Rapids, MI, was robbed by three black males, brandishing handguns. The robbers again vaulted the teller counter and stole money from the teller drawers. One of the robbers attempted to get into the vault, however the vault was locked for the weekend. All three robbers departed the bank in a white Chevy Cavalier, which was recovered by police a few blocks from the robbery. Witnesses who saw the robbers switching vehicles advised the robbers got into a late model black Cadillac. The bank's loss was $13, 681.99.

9.      The VIN number for the Chevy Cavalier was run through State of Michigan databases. The owner was interviewed and advised he sold the vehicle to two black males who bought the vehicle for $250.00 in cash. A grand jury subpoena was issued for the seller's cell phone records.

10.     A comparison of the two sellers' phone records revealed that both were contacted by 616-734-5601. This telephone number was subscribed to by HAKEEN STANKLEY, 32 Batadia, NE, Grand Rapids, MI. Investigation determined that HAKEEN STANKLEY is an alias of SOLOMON HAKEEM JOHNSON (his mother's name is Stanley). JOHNSON's address of record is 32 Batavia, NE, Grand Rapids, MI. Analysis of both seller's records indicated JOHNSON's telephone had contacted both sellers just previous to two black males purchasing the vehicles.

11.     Results also were obtained for the DNA analysis of the glove dropped at the getaway car following the 2/26/2007 LaSalle Bank robbery. The Michigan State Police Laboratory determined the primary donor of the DNA in the glove was SALVATORE RAHEEM LOUIS.

12.     On Tuesday, 12/11/2007, at 1632 hours, the LaSalle Bank located at 1750 Michigan Street, NE, Grand Rapids, MI, was robbed by three black males with handguns. As before, the robbers vaulted the teller counter and robbed teller drawers. One of the robbers entered the manager's office and pulled the manager out into the lobby. The robbers forced the manager to open the vault. After she opened the vault, one of the robbers went into the vault and began taking money. The robbers departed the bank and ran north across Michigan Street. The bank's loss was $96,599.01.

13.     As the robber's were running across the street, witnesses outside the bank saw a dye pack that was taken with the money explode. Several bills were scattered across the street. No switch car was ever located.

14.     Within a few days of the robbery, several carwashes throughout Grand Rapids reported dye-stained money showing up in coin changers. Several of the bills were seized as evidence. GRPD crime technicians were able to develop a latent fingerprint from one of the bills. That latent fingerprint was a match to the fingerprints of SALVATORE RAHEEM LOUIS.

15.     On Thursday, 2/28/2008, the My Personal Credit Union was robbed by two black males. One of the robbers vaulted the teller counter and stole money from two teller drawers, pushing and shoving the victim tellers as he robbed them. The robbers exited the credit union. Witnesses stated that the robbers left in maroon over tan Tahoe or Yukon with a loud exhaust system. The credit union's loss was $985.00.

16.     I and other investigators began looking into the background of SALVATORE RAHEEM LOUIS. It was determined that LOUIS has had several contacts with the GRPD. On 12/29/2006 (GRPD Report #06-116992), LOUIS, SOLOMON HAKEEM JOHNSON, DONOVAN JOSEPH & KENNETH TUCKER were together in a maroon, Lumina, YAX-711. The vehicle was registered to GRENIKA NICOLE MARION, 747 Prince SE, GR, MI. DONOVAN was arrested for outstanding warrants. JOHNSON was arrested for Possession of Marijuana.

17.     On 1/13/2007 (GRPD Report #07-3328), all the above individuals (LOUIS, JOHNSON, JOSEPH, and TUCKER) were together again during a vehicle stop. TUCKER was driving a black 1986 Ford Bronco, AEC-8461. The vehicle is registered to CLARISSA VAUGHN. TUCKER was arrested for Driving while License is Suspended (DWLS).

18. On 3/19/2008 (Kentwood PD report #08-4255), LOUIS was arrested by Kentwood PD for DWLS. He was in a 1994 Olds, tan, MI Tag BTY-8566, which is registered to WILLIAM HENRY-JERVEL BRAYLOCK. LOUIS was arrested in front of apartment 1B, 3075 Creek Drive, Wingate Apartments, in which SHALINDA BROWN, was living.

19. A review of LOUIS' Criminal History Record Information (CHRI), reveals he has been convicted of Robbery, Assault with Intent to Murder, and other more minor offenses.

20. I and other investigators have also been looking into the background of SOLOMON HAKEEM JOHNSON. JOHNSON has also had numerous contacts with GRPD. On 2/20/2007, (GRPD Report #07-13661), JOHNSON and KENNETH TUCKER were together in blue Cadillac Deville. This vehicle is similar in description to the switch vehicle used in the robbery of the LaSalle Bank on 2/26/2007 and the United Bank on 5/19/'2007. The license plate on the vehicle tag is YAX-711. The vehicle is registered to CLARISSA VAUGHN. JOHNSON was driving and was arrested for DWLS.

21. On 2/17/2007, (GRPD report #07-13037), JOHNSON and EMMANULE DAVON DAVIS were stopped in a green, 1996 Lincoln Town car, MI license 2EP-Z30. DAVIS was the driver. JOHNSON was arrested on outstanding warrants.

22. On 12/31/2007 (GRPD Report #07-113767), JOHNSON was the driver of a red over tan, 1995 Yukon, with no license plate. JOHNSON was arrested for DWLS. The vehicle was originally stopped for having a loud exhaust. After running the VIN, it was determined the vehicle belonged to CLARISSA VAUGHN. After the robbery of the My Products Credit Union on 2/28/2008 witnesses described the getaway vehicle used by the robbers as a red over tan Yukon or Tahoe vehicle, with a loud exhaust.

23. On 01/28/2008 (GRPD Report #08-7411/7412), JOHNSON, DONOVAN JOSEPH, and KENNETH TUCKER were in a grey 1997 Plymouth Voyager, Michigan license BTY-45896. The vehicle was registered to CLARISSA VAUGHN. Both JOHNSON and JOSEPH were arrested by GRPD: JOHNSON for DWLS, and JOSEPH for outstanding warrants and for throwing marijuana from the vehicle.

24. A review of JOHNSON's Criminal History Record Information (CHRI), reveals he has had numerous arrests for assault, armed robbery, and drug offenses.

4

## Summary of Drug Investigation

25. On 10/25/2008, the Chemical Bank located at 345 Baldwin Street, SW Jenison, MI, was robbed by two black males in a take-over fashion. Witnesses stated the robbers left the bank and entered a red Chevrolet Corsica and drove off in a northerly direction.

26. On 10/25/2008, the Ottawa County Sheriff's Office received a complaint about a reddish-brown colored car illegally parked in someone's parking space with its lights on. Investigation revealed the vehicle, a Chevrolet Corsica, was registered to JOHN WINGETT. Interviews with WINGETT revealed that WINGETT is a crack cocaine addict and WINGETT had rented his vehicle to some drug dealers for crack cocaine. WINGETT advised that a female prostitute he knew had set up him up with the crack dealers to rent his car.

27. Through investigation, the VCFTF was able to locate and interview the prostitute. She agreed to assist in the investigation, and henceforth will be referred to as Cooperating Witness 1 (CW-1). CW-1 advised she arranged for WINGETT to rent his vehicle to a black male she knew as "J". When shown photos, CW-1 indicated a photo of SOLOMON HAKEEM JOHNSON was the individual she knew as "J". CW-1 was further interviewed on her relationship with JOHNSON and his associates.

28. CW-1 advised that she first met an individual she knew as "King Black" around the same day as she arranged for WINGETT to rent his vehicle to JOHNSON. When shown photos, CW-1 identified a photo of SALVATORE RAHEEM LOUIS as the person she knew as "King Black".

29. CW-1 stated she was at a motel with a fellow prostitute, when she arranged to rent her vehicle to JOHNSON and LOUIS for a gram of crack cocaine. CW-1 stated that LOUIS gave her the crack cocaine in the presence of JOHNSON CW-1 stated this was unusual because JOHNSON was not upset by LOUIS providing her the crack cocaine. CW-1 elaborated that typically, drug dealers don't like sharing their customers with each other. LOUIS and JOHNSON's actions caused CW-1 to conclude that they were working together.

30. When JOHNSON and LOUIS returned with her vehicle, CW-1 stated she, LOUIS, and JOHNSON departed the motel. They traveled to a house in 900 block of Alexander, SE, near the intersection of Dallas and Alexander. LOUIS went into a residence on the north side of Alexander, and returned with crack cocaine that he gave to CW-1. CW-1 and JOHNSON then departed the area, leaving LOUIS at the residence.

31. CW-1 stated that in her subsequent dealings with LOUIS and JOHNSON, LOUIS appeared to be tutoring JOHNSON in the drug trade. CW-1 advised that LOUIS would instruct JOHNSON on how to handle his drug money.

32. CW-1 also identified a photo of EMMANULE DAVON DAVIS as another associate of JOHNSON, a person she knew as "Devon". CW-1 advised that she believed JOHNSON and DAVIS to be brothers.

33. CW-1 advised she has purchased drugs from DAVIS and JOHNSON since approximately May, 2008. CW-1 advised she has purchased crack cocaine from DAVIS and JOHNSON in the vicinity of Brown Avenue on the southwest side of Grand Rapids. CW-1 stated that JOHNSON and DAVIS worked together in supplying crack cocaine to her. At times she would order a quantity of crack cocaine from one of them, but it would be delivered by the other.

34. On 11/13/2008, CW-1 was outfitted with a recording device, per authorization and consent, and was provided with $120.00 in official government funds. CW-1 contacted SALVATORE RAHEEM LOUIS and arranged for him to sell her crack cocaine. LOUIS agreed to meet CW-1 at the Motel 6 located at 3528 28th Street, SE, Grand Rapids, MI.

35. At approximately 1727 hours on 11/13/2008, CW-1 was observed meeting with two black males who drove into the lot in a colored Chevrolet Lumina, MI registration BDQ-4686. CW-1 was observed leaning in the passenger side window, then departing the vehicle. As the vehicle was leaving the lot, Grand Rapids Police Department (GRPD) Vice Units surveilled the vehicle and occupants. After stopping at some stores, the vehicle's driver dropped LOUIS at 933 Alexander, SE, where LOUIS went into one of the residences.

36. CW-1 surrendered the narcotics to investigators. Detective Jim Vakertzis, GRPD, field tested the drugs and they tested positive for cocaine. CW-1 stated during her debriefing that "King Black" (LOUIS) was in the passenger seat and he provided her with crack. The crack cocaine was submitted to the Michigan State Police (MSP) Laboratory for analysis and testing.

37. On 11/14/2008, CW-1 was outfitted with a recording device, per authorization and consent, and was provided with $100.00 in official government funds. CW-1 contacted EMMANULE DAVON DAVIS and arranged for him to sell her crack cocaine. DAVIS agreed to meet CW-1 on Brown Street, SW, just west of Feakin, SW. CW-1 was instructed by DAVIS to pull her vehicle just west of the intersection and DAVIS would meet her there.

38.     At approximately 1713 hours, CW-1 pulled onto Brown Street, just west of Feakin.  At about 1717 hours, a silver mini van, Michigan registration BAZ-5142, which was driven by a lone black male, pulled up next to CW-1's vehicle, so that CW-1 could converse with the driver of the vehicle.  After less than a minute, the silver mini van pulled away.  Investigators followed the mini van to a local liquor store.  After the mini van departed the liquor store, the van was driven directly to the rear of 316 Dickinson, SW, which is that address EMMANULE DAVON DAVIS was paroled to following his release from prison for 2nd degree manslaughter.  A black male was observed exiting the vehicle and entering the residence.

39.     After the van left, CW-1 departed the area and went directly to a predetermined location, where she surrendered the narcotics to investigators.  Detective Vakertzis, GRPD, field tested the evidence and it tested positive for cocaine.  The evidence was later submitted to the MSP Laboratory for analysis and testing. CW-1 stated during her debrief that DAVIS was the driver of the mini van, and that he handed her the drugs out the window of the vehicle.

40.     I note that a check of the Michigan Secretary of States Office revealed that Michigan license plate BAZ-5142 is a 1998 Mercury Villager which is registered to ROBIN RENEE WEEKLEY, 316 Dickinson, SW, Grand Rapids, MI.  I know WEEKLEY to be the mother of EMMANULE DAVON DAVIS.

35.     On 11/18/2008, CW-1 was outfitted with a recording device, per authorization and consent, and was provided with $300.00 in official government funds.  CW-1 contacted SALVATORE RAHEEM LOUIS and arranged for him to sell her crack cocaine.  LOUIS agreed to meet CW-1 in the parking lot of the aforementioned Motel 6.

41.     At about 1807 hours, the white Lumina from previous paragraphs was observed entering the Motel 6 parking lot.  CW-1 approached the vehicle on the passenger's side and got into the vehicle behind the passenger.  After about a minute, CW-1 exited the vehicle.  The vehicle left the parking lot and went westbound on 28th Street.  GRPD vice units followed the vehicle to 1907 Francis, where both occupants got out and entered the residence.

42.     CW-1 departed the area and went directly to a predetermined location, where she surrendered narcotics evidence to investigators.  Detective Vakertzis, GRPD, field tested the evidence and it tested positive for cocaine.  The evidence was later submitted to the MSP Laboratory for analysis and testing.

43.     CW-1 stated during her debriefing that LOUIS was in the passenger seat of the vehicle, and the driver was the same black male that had driven LOUIS on 11/13/2008.  CW-1 advised that LOUIS sold her the crack cocaine.

7

44. The decision was made by investigators to make a second drug purchase from LOUIS. CW-1 was again outfitted with a recording device per authorization and consent, and was provided with $100.00 in official government funds. CW-1 contacted LOUIS and he agreed to meet CW-1 again at the Motel 6.

45. At approximately 2030 hours, the white Lumina described in the preceding paragraphs of this Affidavit pulled into the Motel 6 parking lot. It was driven by the same black male from earlier in the day. CW-1 approached the vehicle on the passenger's side. After less than a minute, CW-1 left the vehicle, and the vehicle departed the lot, westbound on 28th Street. Investigators followed the vehicle, and determined that the passenger appeared to be SALVATORE RAHEEM LOUIS.

46. CW-1 departed the area to a predetermined location. CW-1 surrendered the narcotics evidence to investigators. Detective Vakertzis, GRPD, field tested the evidence and it tested positive for cocaine. The evidence was later submitted to the MSP Laboratory for analysis and testing. CW-1 stated that the crack had been purchased from LOUIS.

47. On 11/19/2008, CW-1 was On 11/18/2008, CW-1 was outfitted with a recording device, per authorization and consent, and was provided with $160.00 in official government funds. CW-1 contacted EMMANULE DAVON DAVIS and arranged for him to sell her crack cocaine. DAVIS agreed to meet CW-1 in the parking lot of the Walgreens located at Michigan and Diamond, SE.

48. At 1500 hours, CW-1 was observed in her vehicle, in the parking lot of the Walgreens Store. At about 1505 hours, a subject fitting DAVIS' description was observed by investigators walking north on Diamond. The subject walked into the Walgreens Store. When CW-1 called DAVIS, he advised he was in the store and would be right out.

49. At 1514 hours, the aforementioned subject walked out of the store carrying a grocery bag and a gallon jug. The subject, identified as DAVIS, walked directly to CW-1's vehicle and got in the passenger side. CW-1 then departed the parking lot, driving south on Diamond, then turning west on Crescent. In the middle of the block, DAVIS exited the vehicle and CW-1 drove off. DAVIS was observed entering 956 Crescent, SE via the most easterly door.

50. CW-1 departed the area to a predetermined location. CW-1 surrendered the narcotics evidence to investigators. Detective Vakertzis, GRPD, field tested the evidence and it tested positive for cocaine. The evidence was later submitted to the MSP Laboratory for analysis and testing. CW-1 confirmed that the drugs had been provided by DAVIS.

8

51. My investigation determined that QUANTEISHA ANN HUDSON is the resident of 956 Crescent, SE. HUDSON is known to be the mother of DAVIS's child.

52. The decision was made by investigators to make a second drug purchase from DAVIS. CW-1 was again outfitted with a recording device per authorization and consent, and was provided with $240.00 in official government funds. CW-1 contacted DAVIS and he agreed to meet CW-1. DAVIS instructed CW-1 to drive all the way to the end of Dickinson, SW and park at the cul-de-sac. For reference, I note that DAVIS was paroled to 316 Dickinson, SW, which is 5-6 houses east of this cul-de-sac.

53. CW-1 departed the area to a predetermined location. CW-1 surrendered the narcotics evidence to investigators. Detective Vakertzis, GRPD, field tested the evidence and it tested positive for cocaine. The evidence was later submitted to the MSP Laboratory for analysis and testing. CW-1 stated that the drugs had been purchased from DAVIS.

54. During her debriefing, CW-1 advised that DAVIS came from a house on the south side of Dickinson with a handicap ramp. She advised DAVIS gave her the crack, then left and went back into the house. This house was later determined to be 332 Dickinson, SW.

55. On 11/26/2008, CW-1 was outfitted with a recording device, per authorization and consent, and was provided with $200.00 in official government funds. CW-1 contacted SALVATORE RAHEEM LOUIS and arranged for him to sell her crack cocaine. LOUIS agreed to meet CW-1 in the parking lot of the Walgreens located at South Division and 28th Street, SW.

56. At about 1540 hours, CW-1 was observed parking her vehicle in the parking lot of the aforementioned Walgreens. About five minutes later, SALVATORE RAHEEM LOUIS was observed crossing the street from the AMERICA's BEST HOTEL, directly across 28th Street from Walgreens. LOUIS got into CW-1's vehicle on the passenger side, and CW-1 departed the lot. She traveled approximately 500 feet west on 28th Street, and pulled between some buildings on the north side of 28th Street. CW-1 circled around and as she approached 28th Street, LOUIS exited her vehicle. LOUIS was observed returning to the AMERICA's BEST HOTEL.

57. CW-1 departed the area to a predetermined location. CW-1 surrendered the narcotics evidence to investigators. Detective Vakertzis, GRPD, field tested the evidence and it tested positive for cocaine. The evidence was later submitted to the MSP Laboratory for analysis and testing. During the debriefing, CW-1 advised investigators that LOUIS had sold the drugs to her, and was interested in "renting" CW-1's vehicle. The decision was made by investigators to "rent" CW-1's vehicle to LOUIS.

58. CW-1 was again outfitted with a recording device per authorization and consent. CW-1 contacted LOUIS and he agreed to rent CW-1's vehicle in exchange for crack cocaine. CW-1 told LOUIS to meet her in the parking of the MOTEL 6, previously mentioned in this affidavit.

59. At about 1938 hours, a brown colored Bonneville was observed entering the lot. The vehicle pulled around to the rear of the hotel, and LOUIS got out of the passenger side of the vehicle. The Bonneville departed the lot. CW-1 was observed entering the lot, and she pulled around to the rear of the hotel. LOUIS got into CW-1's vehicle. CW-1's vehicle pulled around to the front of the hotel, CW-1 exited the vehicle, and LOUIS, who was driving, departed west.

60. CW-1 was taken to a predetermined location. CW-1 surrendered the narcotics evidence to investigators. CW-1 identified LOUIS as the seller of the drugs. Detective Vakertzis, GRPD, field tested the evidence and it tested positive for cocaine. The evidence was later submitted to the MSP Laboratory for analysis and testing.

61. On 12/10/2008, CW-1 placed a telephone call to EMMANULE DAVIS in an attempt to purchase crack from DAVIS. DAVIS advised he was in Phoenix (Arizona), and that he would not be back in Michigan for a week or two. DAVIS told CW-1 that "J", known to be SOLOMON HAKEEM JOHNSON, was in Grand Rapids. DAVIS then provided CW-1 with JOHNSON's cell phone number.

62. At approximately 1626 hours, CW-1 was outfitted with a recording device, per authorization and consent, and was provided with $140.00 in official government funds. CW-1 contacted "J" at the cell phone number provided by DAVIS. "J" agreed to sell CW-1 crack and directed CW-1 to meet him at the party store located at Franklin and South Division.

63. At approximately 1644 hours CW-1 was observed pulling into the aforementioned party store parking lot. Shortly after that, an individual fitting the description of SOLOMON HAKEEM JOHNSON was observed walking west across South Division and was seen getting into CW-1's vehicle. CW-1's vehicle then departed the lot, and drove to 638 Sheldon, SE, where JOHNSON departed the vehicle, leaving CW-1 in the vehicle, and entered the residence.

64. After a brief time, JOHNSON exited the residence and was observed talking on his phone. A silver colored sedan pulled up near the residence, and JOHNSON got in. The vehicle drove north on Sheldon for approximately one block. The vehicle stopped, JOHNSON got out, and returned to CW-1's vehicle. CW-1 then returned to the liquor store parking lot, and JOHNSON got out.

10

65. CW-1 departed the area to a predetermined location. CW-1 surrendered the narcotics evidence to investigators. CW-1 identified JOHNSON as the person who sold the drugs to her. The evidence was later submitted to the MSP Laboratory for analysis and testing.

66. On 1/19/2009, CW-1 was outfitted with a recording device, per authorization and consent, and was provided with $200.00 in official government funds. CW-1 contacted EMMANULE DAVON DAVIS and arranged for him to sell her crack cocaine. DAVIS agreed to meet CW-1 on Brown Street, SW, near Feakin, SW.

67. At about 1248 hours, CW-1 was observed pulling her vehicle onto Brown Street, just west of Feakin, SW. At about 1254 hours, an individual fitting the physical description of EMMANUEL DAVON DAVIS was observed walking southbound on Feakin, SW. The subject turned west on Brown and got into CW-1's vehicle. The subject was wearing a red hooded sweatshirt. CW-1 departed the area with the subject and drove to the Fast Lane Liquor Store located at 1729 Buchanan SW. The subject exited the vehicle and entered the store. In addition to the red hooded sweatshirt, the subject was wearing a black "doo rag".

68. At about 1256 hours, the subject exited the store and got back into the CW-1's vehicle. CW-1 and the subject departed the store, turned west on Brown, then turned north on Feakin.

69. CW-1 departed the area to a predetermined location. CW-1 surrendered the narcotics evidence to investigators. CW-1 identified DAVIS as the person who sold the drugs to her. The evidence was later submitted to the MSP Laboratory for analysis and testing.

70. To date, all the reports received from the MSP Laboratory in regards to this investigation have tested positive for cocaine. In sum, the distributions from LOUIS and DAVIS exceed five grams of crack cocaine; the distributions from JOHNSON are under five grams of crack cocaine.

Based upon the information stated above, I submit that there is probable cause to believe that EMMANULE DAVON DAVIS, SALVATORE RAHEEM LOUIS and SOLOMON HAKEEM JOHNSON are engaged in a conspiracy to distribute crack cocaine in violation Title 21, United States Code, Section 841.

Sean P. Burns, Special Agent
Federal Bureau of Investigation

Sworn and subscribed to before
me this 28th day of January 2009.

HON. HUGH W. BRENNEMAN, JR.
United States Magistrate Judge

12